Last case for argument today is Wide Voice, LLC v. FCC Let's see, we have counsel for the petitioner and for the respondent, FCC, and then for respondent intervenors. So, Ms. Coppola is going to go first for the petitioners. Before you begin, did you wish to reserve time? I do. I wish to reserve five minutes for Roboto. All right, and you've watched argument all morning, so you understand this isn't an addition of five minutes. This comes out of your time. Understood. Please go ahead when you're ready. May it please the Court, Lauren Coppola on behalf of petitioner Wide Voice, LLC. It is antithetical to the rule of law and a clear abuse of agency power for the FCC to penalize an entity for doing exactly what its rules allow. If the FCC is permitted to call something unjust and unreasonable that is expressly permitted and is allowed by this Court to impose penalties for complying, then the agency has pure unfettered power. And so Wide Voice asked this Court to vacate the FCC's first finding that Wide Voice violated Section 201B of the Communications Act as arbitrary and capricious. Now, the FCC has carefully, over the course of many years, laid out rules and regulations about access stimulation. It has called them narrowly focused conditions. These are knowable to the industry. The Commission has expressly articulated what is and is not access stimulation. Then in the order at issue, it's completely ignored those regulations, those narrowly focused conditions, to punish Wide Voice, a company that didn't violate the rules and did not act in any way that would foreseeably provoke punishment. Now, the FCC will concede that Wide Voice has not violated its access stimulation rules. Instead, it said that Wide Voice acted or engaged in unjust and unreasonable conduct by evading rules. So in other words, if Wide Voice would have violated its rules if it had done something different. Meanwhile, the Commission is now engaged in notice and comment rulemaking to establish rules that could possibly govern the conduct or the telephone calls at issues here. And if and when those rules go into effect, the rest of the industry has the benefit of foreseeability, which Wide Voice was not granted here. And let me be clear, Wide Voice wasn't functioning within a gray area. This is not the Commission filling a gap. Wide Voice's conduct was explicitly blessed. So the Commission made a considered decision to create a regulation that access stimulation occurs when a competitive local exchange carrier, what in the industry is referred to as a FELAC, is serving end users. It's not disputed Wide Voice was not serving end users. They changed their model. The Commission will say it changed its model. Well, they either did. So Wide Voice— They either did or they didn't. You know, that's what this whole thing is about. So what Wide Voice did is stopped serving end users for a variety of reasons in the record, Your Honor. It was because of a Ninth Circuit decision from 2019 about certain charges under its tariff and issues unrelated to the issues here because it saw a need in the marketplace to provide the tandem switching services. And it was forethought for years. And correct, it saw regulation coming down from 2019 forward and made a legitimate business decision to stop serving end users. There is nothing improper about Wide Voice's role as a tandem in the call flow. The Commission concedes. It says, you know, there is nothing untoward, I believe is the word the Commission uses, about this call flow. So it doesn't violate the regulation. There's nothing untoward about this call flow, but it's still punished because it found a way to make money. And this can be illustrated, the arbitrariness can be illustrated in the following example. Imagine for a moment if Wide Voice was a haulage company. And the FCC is now charged with regulating transportation on the Golden Gate Bridge. Okay? And after years of comments and rulemaking, the FCC makes a new rule. It says that no trucks can drive over 55 miles an hour on the Golden Gate Bridge. And truck is defined. Wide Voice understands this rule, takes this rule into account, as well as considering several other factors, and decides to sell all its trucks but use vans. Then Wide Voice instructs its drivers not to drive over 45 miles an hour. FCC still punishes Wide Voice and says, if you had not sold your trucks, and if you did not buy vans, and if you did not drive slower than the 55-mile-per-hour speed limit, well then, then you would have violated the new trucking speed limit. That illustration demonstrates that 201B does not permit this kind of unknowable punishment. But, I mean, don't we have to look at what was the whole point of the access stimulation rules? It was to prevent the foisting of these costs onto the long-distance carriers and their customers. The FCC found this was problematic, that these local carriers were finding ways to stimulate calls, free conference calling, chats, et cetera, as a way to make money, but the cost was being borne by consumers. And the FCC decided that's inappropriate, which they're allowed to do. So when they tell you that all you're doing is accomplishing the same thing, it's sort of a bait-and-switch. Now we're going to use a related entity, and they're a voiceover Internet provider, so they don't technically fall into this, but we've created an exact same way for us to make the money and for us to put those costs on the long-distance carriers and their customers, which is exactly what the FCC was trying to stop. Why is that suddenly a due process violation and unknowable, particularly against the backdrop where the FCC has said for decades that you can be charged with unreasonable conduct under 201B without a specific rule violation? Well, I'll take the last part first. I think that the 201B still has to be tethered to a knowable wrong, right? It has to be in all the cases before this court. Do you dispute that Wide Voice knew exactly what they were doing? They were an access stimulation entity. That's what they were about, and they just changed the model to get to the same result. Other companies left the field. They went out of business, but Wide Voice found a way to do the same thing and make money the same way, even though the FCC had said this is not acceptable. Well, I disagree, Your Honor, with the do the same thing in the same way. It was performing an essential function in the call flow. Do the same thing in the sense that they found a way to route the calls so that they could charge the long-distance carriers for it? Well, Wide Voice sits in the middle of a call flow. It didn't have a choice on it has 20 or so customers that it connects calls to, one of which is HD Carrier. Some of those customers, including HD Carrier, increased the volume of calls. Wide Voice was and still is provided that tandem switching service. It's a middleman. And moreover, it's an essential middleman necessitated by a decision that AT&T and Verizon make when it sends the telephone call in TDM. So this is a time division multiplexing. It's an old-fashioned, antiquated way of transmitting calls on the public switch telephone network. But what Wide Voice did was they set up these other corporations to do the same things they had been doing and just left themselves in the middle but got money from both sides when it's all said and done. Well, Your Honor, it doesn't receive money from both sides. Well, your clients control these entities that are now getting the money, right? There is evidence in the record that there is affiliation, but that does not create and, in fact, the commission can't do this. Affiliation being children, the CEO, the chief executive officer, that's affiliation? Is that what you're talking about? Yes, it is. But there's no sham here. The commission concedes that, that there's no sham entities. Well, we have here an entrepreneur. That's not the point. I mean, there isn't a requirement for a sham entity. We're not trying to pierce the veil. They're talking about a sham arrangement. And that's novel. You may use legitimate companies to do this, but the arrangement is still a sham in that it is clearly designed to circumvent the access stimulation rules to allow white voice to continue on the same path and make money in the same way, which is not wrong, but it is wrong when the FCC said that you're making money at the expense of consumers. So a couple things here. First, the commission, there is no precedent for a sham arrangement. We have a legitimate call flow. Like I started with earlier, it is said there is nothing untoward about the flow, about white voice being a tandem connecting calls to a VOIP end office. So we have a legitimate call flow and legitimate entities. What was white voice on notice? How could white voice be on notice that using a legitimate call flow with legitimate entities would end up in it being punished? White voice knew what the FCC's rules were and what they were trying to stop and that they were not allowed to do this access stimulation anymore. They knew that for certain. Correct. And what they did was find another way to do it. So they were certainly on notice. So they were on notice that access stimulation, right, the FCC has said charging long distance carriers as an access stimulator is unjust and unreasonable. But here, and words matter, definitions matter, regulations matter. It was not an access stimulator under those regulations. It connected calls to its many customers and through a legitimate call flow to legitimate entities that had been in business for many years. It could not have been on notice. There is no precedent that it was unjust and unreasonable for it to provide legitimate services to legitimate entities. Where's the sham? There is no precedent for a sham arrangement. The cases before this court involved the creation of shell entities. Those are the only cases that it's provided this court. How could white voice been on notice by engaging at an arm's length transaction through contracts with one of its 20 customers result in punishment? Punishment that is worse or harsher than if an entity was to be deemed an access stimulator. Which one of the 20 companies are you talking about? HD Carrier, sir. Isn't HD Carrier close related to white voice? It has some overlapping commonalities. They are closely related. And Free Conference and also is the same? Correct, Your Honor. And one of those has a trust designated Mr. Erickson's children as the beneficiaries of 88% of white voice? There's no dispute that those entities are related. They're the product of an entrepreneur that set up various businesses over 20 years. But closely related entities do not create a sham. How is white voice to be on notice that it was unjust and unreasonable to do business with one of its customers that was closely related? What white voice did at the end of the day is it set up these other entities so that they could do what it no longer could do under the new rules, right? Respectfully, I disagree, Your Honor, because these entities were created many years before these regulations were even put out for notice of comment in rulemaking. And moreover, these entities all do business with other entities. It is sharply distinguishable from the only two cases that are before this court, which is where one entity created a shell entity, like you describe, Your Honor. That is not the case here. And the commission, without setting forth specific cogent reasons, flatly rejects or ignores the evidence in the record on that as it's required to do under the Ashcroft case. And let me close by saying that if we are to allow the commission to penalize a company who is in compliance with its rules, it gives 201B no limits. There has to be tied to an unknowable wrong. And this was not a knowable wrong. It's not knowable under its sham precedent, and it's not knowable under the access stimulation rules that it created with specificity, which the commission called narrowly tailored, narrow conditions. Let me ask you this. In your view, there's no administrative case in the FCC that is in any way analogous to what they did here? No, Your Honor, especially that this is retroactive rulemaking. This isn't the FCC taking a rule and then applying that rule through adjudication to a specific set of facts. There's no rule that's on point that they're applying to retroactively punish an industry actor for years prior. Okay. Thank you. Thank you. All right. Mr. Scheer? Mr. Scheer? Good morning. May it please the Court. William Scheer on behalf of the respondents. Access stimulation distorts competition and raises the costs of calls for everyone by forcing long-distance carriers to subsidize the costs of high-volume call traffic. In 2019, the commission revised its rules to impose responsibility for such costs on the carrier that directs the traffic instead of long-distance carriers. WideVoice was an access stimulator before the rule change, delivering high-volume call traffic at the expense of long-distance carriers to Free Conferencing, a company owned by WideVoice founder David Erickson. In response to the rule change, WideVoice started handing off the same traffic for delivery to Free Conferencing to HD Carrier. HD Carrier is another David Erickson company. WideVoice continued charging long-distance carriers, claiming that the new rules didn't apply to it because it was no longer delivering the traffic and it was merely acting as a middleman. Now, in response to a complaint, the commission reasonably found that WideVoice's new arrangement was a sham to preserve its ability to extract millions of dollars in access fees from long-distance carriers. The commission's finding was based on evidence that was undisputed, including the history of the call traffic, the timing of WideVoice's new arrangement, and its ties to HD Carrier and Free Conferencing, all of which demonstrated that the three companies did not act at arm's length. Now, WideVoice argues that it acted in good faith, but WideVoice's plain object was to avoid its financial responsibility under the new rules. Other access-stimulating carriers stopped carrying Free Conferencing calls in response to the rule change. WideVoice took advantage of their genuine compliance efforts by scooping up the abandoned traffic and expanding its cost-shifting scheme. WideVoice also argues that the commission exceeded its authority by finding a statutory violation without applying the access-stimulation rules. But it's well established that sham arrangements to evade regulation violate the statutory just and reasonable standard. As the Supreme Court long ago recognized, the commission must have the power to prevent evasion of its orders. And there's nothing arbitrary or vague about the commission applying the just and reasonable standard in those circumstances. Um... She just said that there was no... Your counsel just said there was no case, no instance that she could point to, in any case where the FCC has ever done this. Your Honor, the commission in its order relied principally on three of its precedents, the Total Telecom case, All-American, and Alpine. We would submit that all three of those are directly on point. WideVoice has tried to distinguish the Total Telecom and All-American cases because the sham entities in those cases were newly formed. But the sham was the creation of those entities to extract fees and evade regulation. The sham here is the exact same sham. It's the use of these different related companies in order to extract fees that, as Judge Collins said, WideVoice itself could no longer directly extract from long-distance carriers because of the change in the rules. So how did HD Carrier play into this call routing before the new rules? So I understand the FCC's position that WideVoice, instead of delivering the calls, delivered them to HD Carrier to deliver it to the end user so that they could not be the ones delivering the final call and taking the fee. But what was HD Carrier doing before? How did they play into the call routing? Were they delivering calls before? Your Honor, my understanding from the record is that HD Carrier has some independent business relationships and carries other traffic. The traffic that was at issue here was free conferencing traffic. Some of the traffic WideVoice delivered directly to free conferencing prior to the rule change. The majority of the traffic was traffic that was carried by other access-stimulating carriers and delivered to free conferencing. HD Carrier played a role in the inheritance, in WideVoice essentially vacuuming up that traffic that the others had abandoned. WideVoice's contention was that HD Carrier was acting independently of WideVoice in obtaining that traffic and assigning WideVoice as merely an intermediary tandem provider. But the Commission rejected the notion that WideVoice didn't have, was passive in that, that WideVoice didn't play an active role and didn't direct the traffic. Are there other providers who are in this tandem role that WideVoice has here that they would be the intermediary between the long-distance carrier and the HD Carrier or whoever else might deliver the traffic? I don't think that the record reflects who the tandem providers were for most of the traffic that's at issue here prior to the rule change and the other carriers abandoning it. There are carriers, there are entities that operate as tandem providers solely, the way that WideVoice maintains it transformed itself into. The reason that the Commission wrote the rules in order to apply to carriers that deliver calls to end users and not to tandem providers is that the record before the Commission when it adopted the rule change was that access stimulation schemes had evolved since the Commission first adopted the rules so that there were two specific tandem providers in Iowa and South Dakota that were passive participants in the majority of the access stimulation schemes that were around at that time. So the Commission wrote the rules to leave entities that are only passive participants, that are sort of involuntarily in the call path out of the rules. And I think that just reflects the nature of the rules. The rules don't create a safe harbor and they don't describe the universe of conduct that's unjust or unreasonable under the Act. What the rules do is they prescribe specific conduct that the Commission's identified as unjust and unreasonable based on the rulemaking record before. But the Commission obviously couldn't, by adopting specific rules prescribing access stimulation based on the conduct that the Commission's seen so far, the Commission couldn't lose the underlying authority under the statute to prescribe additional conduct that it couldn't anticipate, couldn't foresee. The Commission explained in the order that adjudication is particularly well suited to these kinds of situations that the Commission can't anticipate in advance, partly because it can't determine how carriers are going to respond to rule changes. We would ask that the Court affirm the Commission's order and if there are no further questions, I'll sit down. Your opposing counsel said something in her argument that suggested the FCC is in a rulemaking process and is going to change these rules. Is that accurate? There is a pending rulemaking proceeding. It's referred to in White Voice's 28J letter in our response. The Commission, partly in response to what happened in this case and partly maybe in response to other information before it, issued a notice of proposed rulemaking asking about the particular circumstances in which there's a voice-over Internet protocol provider or IPES provider like HD Carrier in the call path and there's a tandem provider handing off calls to the IPES provider for delivery to the end user. There is an argument that the Commission referred to that under the existing rules that situation is covered, in fact, and the Commission certainly didn't concede in the order on review that the rules don't cover the situation here. The Commission simply didn't reach it. What the Commission did here was not to establish a rule going forward about the presence of VoIP providers in the call path. The Commission simply concluded that, based on the substantial evidence before it, this particular arrangement was a sham to evade the rules and extract access fees. The Commission's rulemaking proceeding is a natural reflection of how the administrative process works. Previously to the rule change, the Commission didn't anticipate this kind of situation in which a tandem provider might be actively directing the traffic. It turns out that that's another way that some carriers may be using to evade the overall prescription on extracting fees from long-distance carriers for this high-volume call traffic, so that's why the Commission initiated that proceeding. But I think Wide Voice's argument would be that if the Commission has to engage in additional rulemaking, that they would not be unnoticed, that what they were doing was prohibited. Right, Your Honor, and I think that the answer to that is that Wide Voice knew exactly what it was doing. It may have been unclear to Wide Voice and to others in the industry whether it would be legitimate to set up a call path, whether the rules cover non-carriers, voice-over Internet protocol providers. It's not unclear to anyone in the industry who's been reading the Commission's orders over the last 20 years that the harm that the Commission is targeting with these rules is forcing long-distance carriers to subsidize the costs of high-volume call traffic. So when an entity rearranges its business in order to preserve its ability to do that specific thing, then there's no question that that is an unjust and unreasonable action. Any other questions? Okay, thank you. Thank you. All right, so we have Mr. Hunsater. It's Mr. Hunsater, that's correct, thank you. Good morning, and may it please the Court, I'm Michael Hunsater representing AT&T as intervenors in support of the respondents. I'd like to start with the notion that there's no precedent out there on sham arrangements. Not true. This case is exactly like the Total case from 2001 and very similar to the Al-Amerin case. Indeed, this is probably worse of a sham entity case than those other two cases which I was involved in, in the following respect. I mean, yes, these entities weren't created out of whole cloth. They were just repurposed. But what was worse here is, and I'd like to call your attention to the extensive part of the order that's not on appeal and that's not challenged, which is that they caused call congestion. And the FCC said in paragraph 46 in footnote 113 of the order, wide voice worked with both free conferencing and HD carrier to continue the flow of traffic, even in the face of inadequate facilities for carrying the traffic. This underscores the fact that these entities worked together in a common enterprise. So these entities were so bent on continuing the access stimulation schemes and on a bait and switch, to use your term, Judge Beatty, and to obtain the exact same harms, they were willing, as a coordinated effort, to have calls blocked. And they're not contesting that. And they're not contesting the reasons for that. And the reason was they hoped to pressure my client and Verizon to come in and say, hey, you're blocking calls, so you better come in and pay us in a settlement or some negotiated agreement. That's how they intended to perpetrate the schemes. And so that factor is actually worse and more aggravating than the other sham arrangement precedents. And so the notion that there's no notice of this, the FCC obviously has broad authority, as this Court has held in Metrophones, Supreme Court has held, it has a gap to fill, to say that what Judge Collins said, you're doing something that you cannot do directly. Wide voice, terminating the calls to free conference, they clearly cannot bill under the 2019 order for that call arrangement. And so the question is, well, it's somehow different if this HD carrier entity is somehow just magically placed in the middle. And the answer to the question that the FCC gave, which was entirely reasonable, is that arrangement, that indirect arrangement, is basically the same in substance as the direct arrangement. Finally, let me just switch to the retroactivity point, because I think it's come about all the wrong way, because this is an adjudication. This is a complaint case that we filed under Section 208 of the Act. And as we all know, in adjudications, retroactivity is the norm. And for them to prevail, it's not enough to say, this is a gray area, or, gee, I didn't know what the status of these VOIP entities is. They would have to cite the precedent in their favor, where the FCC has said, hey, it's fine to do access stimulation as long as you use a VOIP entity. There's obviously nothing of the sort like that in the record of any of the decisions that the FCC's rendered on access stimulation over the past 15 to 20 years. Finally, I guess I agree with Mr. Scheer that what Wide Voice is asking you to do is to take the 2019 regulations and turn those into safe harbors, so that, again, when there's no finding, again, there's no concession by us that they weren't directly subject to the rule. There's just no finding one way or the other. So there's no finding that... But even if there were a finding by the FCC that Wide Voice complied with the 2019 regulations, that's not an immunity from Section 201. Okay? To have an immunity from Section 201, you need a safe harbor regulation. The FCC occasionally does that. I can cite examples. But when they say, hey, if you do X, Y, and Z, there will be no liability under the Communications Act, that's a safe harbor. And where there's that kind of regulation and the entity actually does A, B, and C, then it's improper to punish. That's not at all what happened here. Excuse me, Your Honor. Go ahead. What you did was you complained because Wide Voice put you in the same position that you were before when they did what they did. Exactly. Thank you, Your Honor. I have nothing further unless there's other questions from the Court. All right. Thank you. All right. Ms. Coppola. What you've heard a lot of here is basically once a criminal, always a criminal. The access stimulation rules are explicitly drafted so that a company that is found to be an access stimulator is one for six months. It can essentially change its traffic profile and no longer be an access stimulator. It is not the case that once an access stimulator, always an access stimulator. That's not how the rules are drafted. Moreover, there is an explicit safe harbor under 47 CFR 51.914D. Any local exchange carrier that is not itself engaged in access stimulation, as defined by the definition, but serves as an intermediate access provider with respect to traffic that goes to an access stimulator, which isn't even the case here because, as the Commission said, it's unclear whether VOIPs are included, shall not itself be deemed to be an access stimulation. There is an express safe harbor. Okay? This was foreseen in the creation of the 2019 rules. In the very first footnote of our opening brief, Wide Voice puts in the record that entities, as the Commission, to include VOIP entities in the access stimulation regulations. The Commission did not do that. So to have a rulemaking procedure going on right now that the whole industry gets the benefit of, where Wide Voice, because it has commonalities, is punished, applies a different rule to Wide Voice than everybody else. Moreover, we keep talking about access stimulation, traffic access. These are conference calls. These were conference calls made by people in a pandemic, and they needed to be connected. This wasn't... This was one... It's not traffic that moved. Every telephone call that gets made is a new telephone call made by people who needed their calls connected in a pandemic. And so there is no... of call paths here. Wide Voice was and remained as a tandem in a call flow that was explicitly nothing untoward about and within the safe harbor provisions. The regulations have to have meaning. 201B has to have a limit. Total telephone and all-American are not on point. In those cases, the Commission said... talks about how at no point were the entities available or operating as bona fide or to provide services to the public at large. That's a sham. Those are sham entities with no legitimate business purposes or arm's length transactions. These entities here were not shams. This is improper retroactive rulemaking. And I'd encourage the Court to look at the Montgomery Ward Ninth Circuit case on the limitations. And that's at 691 F. 2nd 1322. It's a Ninth Circuit case from 1982. And that case instructs us that an agency cannot retroactively amend or create a rule, which is what it did here when it found a violation of 201B that is not grounded in any legal precedent and there is no violations of the Commission's rules and regulations on access stimulation. The rest of the industry should not be afforded the benefit of comment on rulemaking on matters that the Commission has conceded are unclear when, in wide voice, gets punished for legitimate business planning. Thank you, Your Honors, for your time this morning. Thank you. Thank you, Counsel, for your arguments this morning. They were helpful. And this case is taken under submission and we are in recess until tomorrow morning. All rise.
judges: PAEZ, BADE, Collins